******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STEPHEN J. R.*  *v.*
COMMISSIONER OF CORRECTION
(AC 39251)

Keller, Mullins and Lavery, Js.**

*Syllabus*

The petitioner, who had been convicted of various crimes in connection
with his alleged sexual abuse of the child victim, sought a writ of habeas
corpus, claiming that his trial counsel provided ineffective assistance
by failing to consult with and present the testimony of an expert on
false memory syndrome in child sexual assault cases. The habeas court
rendered judgment denying the petition and, thereafter, denied the peti-
tion for certification to appeal, and the petitioner appealed to this court.
*Held* that the habeas court did not abuse its discretion in denying the
petition for certification to appeal, the petitioner having failed to demon-
strate that trial counsel's performance was deficient: it was clear from
the record that trial counsel's decision to focus on the victim's lack of
credibility and the inconsistency in her story was a matter of trial strat-
egy, and there was no requirement that counsel call an expert when
counsel, after conducting his own research, specifically considered the
false memory defense and made the strategic decision to attack the
victim's credibility rather than present expert testimony, which was
a reasonable strategic approach; accordingly, the petitioner failed to
demonstrate that the issue raised was debatable among jurists of reason,
that a court could resolve the issue differently, or that the question
raised deserved encouragement to proceed further.

Argued September 13—officially released November 7, 2017

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district of
Tolland, where the court, *Fuger, J.*, rendered judgment
denying the petition; thereafter, the court denied the
petition for certification to appeal, and the petitioner
appealed to this court. *Appeal dismissed.*

*Robert O'Brien*, assigned counsel, with whom, on the
brief, was *William A. Adsit*, for the appellant (peti-
tioner).

*Denise B. Smoker*, senior assistant state's attorney,
with whom, on the brief, were *Brian Preleski*, state's
attorney, and *Grayson Colt Holmes*, former special dep-
uty assistant state's attorney, for the appellee
(respondent).

*Opinion*

MULLINS, J. The petitioner, Stephen J. R., appeals following the habeas court's denial of his petition for certification to appeal from the judgment denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly denied his petition for certification to appeal after erroneously concluding that his criminal trial counsel, Christopher Eddy, had provided effective assistance despite his decision not to consult with and present the testimony of an expert on false memory syndrome in child sexual assault cases. We conclude that the court did not abuse its discretion in denying the petition for certification to appeal, and, accordingly, we dismiss the appeal.

On direct appeal from the petitioner's underlying conviction, our Supreme Court set forth the following relevant facts that the jury reasonably could have found. "During all relevant periods of time, the [petitioner] was a long haul truck driver from Georgia, whose job took him through Connecticut at various times throughout the year. In the spring of 2002, the [petitioner] and [the victim's] mother, A, met and later began a dating relationship. This relationship lasted from approximately April, 2002 to April, 2003, when [the victim] was approximately seven years old. During that period of time, the [petitioner] stayed with A and [the victim] in their one bedroom apartment . . . four or five times, in stays ranging from overnight to three or four days, in addition to a multiweek stay on one occasion while A recuperated from an accident. When the [petitioner] stayed overnight, he routinely would drive A to work at 8:30 a.m. and pick her up at approximately 5:30 p.m. At approximately 3 p.m., the [petitioner] would pick [the victim] up from school. As a result, the [petitioner] and [the victim] were alone in the apartment each afternoon for approximately one and one-half hours.

"One day between April and June, 2002, when [the victim] was at home after school, she went from the living room into the bedroom that she shared with her mother to play with her dollhouse. When [the victim] entered the bedroom, she found the [petitioner] undressed on the bed. The [petitioner] told her to put his penis in her mouth, and she did. The [petitioner] then pulled down her clothing from the waist down and put his tongue on her vagina. Afterward, the [petitioner] instructed [the victim] not to tell her mother about what had happened.

"Several months into A's relationship with the [petitioner], she noticed a change in [the victim's] attitude toward the [petitioner]. [The victim] seemed afraid of the [petitioner] and uncomfortable around him. On one occasion, when the [petitioner] asked [the victim] to go somewhere with him, she ran to her mother and said, 'Mommy, I don't want to go with him anymore.'

In April, 2003, A broke off her relationship with the [petitioner].

"In January or February, 2006, the [petitioner's] sister called A and asked her if the [petitioner] had done anything sexually to [the victim]. A then posed that question to [the victim]. [The victim] denied the abuse to her mother because she thought that if she 'broke that secret that something bad would happen.' Several more times during the next two years [the victim] denied to her mother that the [petitioner] had sexually assaulted her. In November or December, 2007, however, [the victim] admitted to a friend that the [petitioner] had 'raped' her. In February, 2008, [the victim] finally admitted to her mother that the [petitioner] had sexually assaulted her. Soon after, A contacted the police, which led to the [petitioner's] arrest.

"With respect to the three additional incidents,[1] the state offered the following evidence. [The victim] testified that the incident she had described occurred '[three] or four times' before her mother broke off her relationship with the [petitioner] in April, 2003. [The victim] stated that '[i]t was always the same thing' and in 'the same place.' When the [petitioner] was engaging in these acts, he would entice [the victim] with promises of taking her out for ice cream or to play miniature golf. He fulfilled those promises . . . . Further, the [petitioner] told her to keep the sexual acts a secret from her mother 'every other time it would happen.'

"The state also presented the DVD of [the victim's] April 11, 2008 diagnostic interview with Lisa Murphy-Cipolla, a clinical child interview supervisor at the Aetna Foundation Children's Center at Saint Francis Hospital and Medical Center. During the interview, [the victim] told Murphy-Cipolla that the [petitioner] would put his mouth on her vagina and he would make her put her mouth on his penis. [The victim] also identified on diagrams of male and female anatomy where she had touched the [petitioner] and where he had touched her, consistent with her statements. When asked how many times this conduct occurred, [the victim] answered 'five to six times.' Murphy-Cipolla testified that delayed disclosure is common in cases of reported child abuse.

"At the end of the state's case, the [petitioner] moved for a judgment of acquittal on all charges. The court denied the [petitioner's] oral motion, and the jury thereafter returned a verdict of guilty on all sixteen counts. The trial court rendered judgment in accordance with the jury's verdict . . . ." (Footnotes altered.) *State* v. *Stephen J. R.*, 309 Conn. 586, 589–92, 72 A.3d 379 (2013). Our Supreme Court affirmed the petitioner's conviction on direct appeal. Id., 607.

On July 24, 2015, the petitioner filed a second amended petition for a writ of habeas corpus in which

he alleged in relevant part that his criminal trial counsel had provided ineffective assistance by failing to "investigate alternative theories to explain why the [victim] would fabricate, lie, or provide inaccurate, mistaken, or incorrect information alleging sexual abuse" and by failing to present expert testimony. In a May 4, 2016 memorandum of decision, the habeas court denied the petition after finding that criminal trial counsel's "assistance was completely reasonable considering all the circumstances: he investigated the case, prepared for trial, and employed reasonable trial strategies." The habeas court further found that, even if it assumed, arguendo, that criminal trial counsel had performed deficiently in a manner alleged by the petitioner, the petitioner had not established that he was prejudiced by that performance. The habeas court, accordingly, denied the petition for a writ of habeas corpus. The court, thereafter, also denied the petition for certification to appeal. This appeal followed.

On appeal, the petitioner contends that the court abused its discretion in denying his petition for certification to appeal from the denial of his petition for a writ of habeas corpus. Specifically, he argues that the habeas court erred because the record established that his criminal trial counsel had provided ineffective assistance by failing "to utilize an expert to support a false memory[2] defense."[3] (Footnote added.) We disagree.

Initially, we set forth our standard of review. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and the applicable legal principles. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by this court for determining the propriety of the habeas court's denial of the petition for certification. Absent such a showing by the petitioner, the judgment of the habeas court must be affirmed. . . .

"[As it relates to the petitioner's substantive claims, our] standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well set-

tled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the underlying] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Citation omitted; internal quotation marks omitted.) *Mourning* v. *Commissioner of Correction*, 169 Conn. App. 444, 448–49, 150 A.3d 1166 (2016), cert. denied, 324 Conn. 908, 152 A.3d 1246 (2017).

"To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong . . . ." (Internal quotation marks omitted.) *Brian S.* v. *Commissioner of Correction*, 172 Conn. App. 535, 538–39, 160 A.3d 1110, cert. denied, 326 Conn. 904, 163 A.3d 1204 (2017).

"We also are mindful that [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Hilton* v. *Commissioner of Correction*, 161 Conn. App. 58, 66–67, 127 A.3d 1011 (2015), cert. denied, 320 Conn. 921, 132 A.3d 1095

(2016); see also *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 632, 126 A.3d 558 (2015).

"[T]he United States Supreme Court has emphasized that a reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Internal quotation marks omitted.) *Brian S.* v. *Commissioner of Correction*, supra, 172 Conn. App. 539–40. We now turn to the merits of the petitioner's claim.

The petitioner claims that his criminal trial counsel rendered ineffective assistance of counsel by failing "to utilize an expert to [present and] support a false memory defense." He contends that the result of the criminal trial likely would have been different had counsel consulted and presented such an expert. The respondent, the Commissioner of Correction, asserts that the habeas court properly found that the assistance provided by counsel was "completely reasonable" in this case and that, even if counsel had performed deficiently in the manner alleged, such deficiency was not prejudicial to the petitioner. We conclude that trial counsel's performance was objectively reasonable and, therefore, that the petitioner failed to prove his ineffective assistance claim.

During the habeas trial, the petitioner presented the testimony of David Mantell, a licensed clinical psychologist, who has a Ph.D in clinical psychology, among other degrees. Mantell testified about proper protocol for interviewing suspected child abuse victims. He opined that yes and no questions lead to less reliable information because they present a "forced choice closed option" situation. He also opined that questions that cause children to guess at the answer or that provide multiple optional responses are unreliable. Mantell explained that in his opinion answers to open-ended questions are the most reliable. Mantell stated that he had reviewed the child forensic interview aspects of this case, and that, in his opinion, the interview that had been conducted was thorough in some respects and not thorough in other respects.

Mantell discussed some of the things that he believed were not thoroughly covered in Murphy-Cipolla's questions to the victim. He also criticized Murphy-Cipolla for not formulating an alternative hypothesis to bring "to the attention of the child . . . other possibilities through which the child might have acquired the suspicion or belief that abuse had occurred, when perhaps it had not occurred." Mantell then opined that he

thought it was possible that the victim "may have developed a false memory of abuse based on the fact that she had been asked about abuse multiple times . . . ." Mantell testified that he came to this conclusion for several reasons. He thought it was significant that the victim did not report the abuse prior to being questioned by her mother several years after it had happened. He also found it significant that the petitioner had not been involved in the victim's life for many years prior to her disclosure, and that she failed to provide a level of detail of the abuse. He found it persuasive that the victim also was inconsistent about her age and her grade level at the time of the abuse, and that she used a different developmental level of language or words when describing these events, some being much more adult and others being more childlike. He stated that this combination of facts led him to conclude that the victim may have experienced false memories of the alleged abuse.

Criminal trial counsel, Eddy, also was called to testify at the habeas trial. He testified that, through discovery, he received the forensic interview file and the DVD of the actual interview conducted by Murphy-Cipolla. He also received the victim's records from the Wheeler Clinic. Eddy was asked by the petitioner's habeas attorney to describe the theory of defense that he had chosen for the petitioner's criminal trial. Eddy responded: "I think my theory of the case was one of reasonable doubt, that the [victim] made inconsistent and incomplete reports; her testimony was inconsistent and incomplete. That the state did not prove beyond a reasonable doubt that abuse occurred. That there were . . . denials and that . . . the disclosure lacked sensory details, and that, ultimately, the jury should determine that [the victim] lacks credibility because you have to assess whether the child used her own vocabulary. Did the child reenact trauma? Was the child's affect consistent with the accusations? Did the child have a good recall of those details? And the answers to all of those questions is no. There was no threat and no pressure or coercion—just, frankly, the story doesn't make sense. It's not plausible. There is a lack of progression from a less to more intimate physical contact . . . ."

Eddy further explained that, since there was no medical evidence to substantiate the abuse allegations, the case "obviously [came] down to credibility," and he acknowledged that his job was to attack the victim's credibility and to make her seem unbelievable. He stated that he defended the case in a manner that would give the jury a reasonable doubt about the crimes charged. He also testified that he had sought successfully to exclude information of prior sexual misconduct committed by the petitioner against other children, for which the petitioner had served time in Florida.

Additionally, Eddy testified that he conducted research in anticipation of cross-examining Murphy-Cipolla, as well as other witnesses, by going to the Yale Law Library and reading several publications, including: " 'Child Sexual Abuse: Disclosure, Delay, and Denial,' [by] Pipe, Lamb, Orbach and Cederborg, 2007; 'Tell Me What Happened: Structured Investigated Interviews of Child Victims and Witnesses' by [Lamb, Hershkowitz, Orbach and Esplin], 2008; 'Investigative Interviews of Children: [A Guide for Helping Professionals]' by Poole and Lamb; 'Jeopardy in the Courtroom: [A] Scientific Analysis of Children's Testimony' by Bruck and Ceci; [and] 'Expert Witnesses in Child Abuse Cases: [What Can and Should Be Said in Court]' by Ceci and Hembrooke, among others." He also familiarized himself with the RATAC[4] protocols used by forensic interviewers, and he reviewed the victim's mental health records.

When asked whether it was a strategic decision not to call an expert, Eddy explained: "Yes. The reason I didn't call an expert was because we didn't have a situation where there was custody or explanation for the child lying. The state was not attempting to introduce lots of child behavioral issues. Having watched the video [of the forensic interview], there was not a strong claim that could be made that it was overly suggest[ive]. There w[ere] no dolls being used or play therapy, the things that are found to be not appropriate. There were no medical findings that I needed to dispute. This is not a situation where we had a *Jarzbek* situation[5] or anything like that, so that was my rationale for not calling an expert." (Footnote added.) He also stated that he had considered false memory, but did not argue it.

Following closing argument at the habeas trial, the court denied the petition for a writ of habeas corpus on the ground that Eddy's performance was not deficient and that the petitioner had not demonstrated prejudice. Specifically, the court concluded that Eddy's "assistance was completely reasonable considering all the circumstances: he investigated the case, prepared for trial, and employed reasonable trial strategies." The court further concluded that even assuming, arguendo, that Eddy's performance was deficient, the petitioner had failed to demonstrate that such deficiency caused him prejudice. We agree with the habeas court and conclude that the petitioner has failed to demonstrate that criminal trial counsel's performance was deficient.

It is clear from the record as set forth previously in this opinion that trial counsel's decision to focus on the victim's lack of credibility and the inconsistency in her story was a matter of trial strategy. Although the petitioner argues that trial counsel should have called an expert to discuss false memory syndrome, there is no requirement that counsel call an expert when he has developed a different trial strategy. "[T]here is no per se rule that requires a trial attorney to seek out an expert

witness. . . . Furthermore, trial counsel is entitled to make strategic choices in preparation for trial." (Internal quotation marks omitted.) *Brian S.* v. *Commissioner of Correction*, supra, 172 Conn. App. 542.

Indeed, our Supreme Court expressly has declined to adopt a bright line rule that an expert witness for the defense is necessary in every sexual assault case. *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 100–101, 52 A.3d 655 (2012). We recognize, however, as the petitioner points out, that our Supreme Court also has stated that "in certain instances, the employment of an expert for the defense may be constitutionally mandated by the facts and surrounding circumstances of the case . . . ." Id., 101. The petitioner, however, has not demonstrated that the present case is such a matter. In this case, which boiled down to a credibility contest, trial counsel, after conducting his own research, specifically considering the false memory defense, and reviewing the facts of the case, made the strategic decision to attack the victim's credibility rather than present expert testimony. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." (Internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, 325 Conn. 426, 444, 159 A.3d 109 (2016).

Here, trial counsel told the habeas court that he, in fact, had considered false memory but did not argue that theory to the jury, instead focusing on the victim's lack of credibility. Trial counsel explained that he wanted the jury to find the victim not credible and to conclude that there was a reasonable doubt as to the petitioner's guilt, and that he proceeded with that trial strategy. He also conducted independent research to assist with the petitioner's defense. A review of trial counsel's closing argument at the petitioner's criminal trial reveals that counsel pointed out to the jury that there were many inconsistencies in the victim's testimony and that her details were incomplete. He argued that there were inconsistencies in her statements as to her age and her grade level at the time the abuse was alleged to have occurred. He also pointed out the victim's delay in reporting and her repeated denials that abuse had occurred, despite the fact that the petitioner was no longer present in the home or involved with her or A. He discussed the lack of emotion from the victim and her varied vocabulary and descriptions of the abuse, which, at times, sounded "almost clinical." On the basis of this record, we agree with the habeas court that this was a reasonable strategic approach.

"It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel

was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Clinton S.* v. *Commissioner of Correction*, 174 Conn. App. 821, 831–32, 167 A.3d 389 (2017).

We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal. The petitioner has not demonstrated that the issue he raised on appeal is debatable among jurists of reason, that the court could resolve the issue in a different manner, or that the question raised deserves encouragement to proceed further.

The appeal is dismissed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Our Supreme Court noted that, although the long form information did not indicate that the sixteen counts with which the petitioner had been charged occurred in the course of four incidents, the defendant and the state agreed that the state's theory at trial was predicated on the sixteen counts occurring during the course of four incidents. *State* v. *Stephen J. R.*, 309 Conn. 586, 589 n.3, 72 A.3d 379 (2013).

[2] The petitioner's expert, David Mantell, a forensic psychologist, testified that "repeated questioning of children and adults can lead some adults to form false memories about events that didn't occur, or [that] didn't occur in the way that they are being recalled. . . . [The repeated questioning] . . . can . . . lead to the development of an entirely false memory . . . ."

[3] Although this precise allegation of ineffectiveness does not appear in the petition for a writ of habeas corpus or in the petitioner's pretrial brief to the habeas court, and, in fact, the words "false memory" do not appear in those documents at all, the petitioner's habeas counsel presented expert testimony from Dr. Mantell on this theory and included it in his closing argument at the habeas trial. The habeas court construed the petition to have included such a claim or a close variation thereof, and stated, in its memorandum of decision, that the petitioner in part had alleged that criminal trial counsel failed to "adequately present testimony that contradicts, refutes, offers alternative explanations for and otherwise challenges the [victim's] allegations." The respondent has not objected to the claim set forth by the petitioner on appeal or to our consideration of the claim as presented.

[4] Mantell explained that the CornerHouse RATAC Protocol "was one of many available protocols to guide forensic interviews . . . [a]nd it was the one that was selected here in Connecticut, and also in many other states across the country . . . . And it describe[s] a series of phases or steps that interviewers [are] expected to pass through in order to conduct a protocol compliant best practice interview." Mantell also explained what the RATAC initials stand for: "R, is for rapport building, A, is for anatomical body-part review, T is for touch-contact review, A, is for abuse inquiry, and, C is

for closure.''

<sup>5</sup> "In cases involving the alleged sexual abuse of children, the practice of videotaping the testimony of a minor victim outside the physical presence of the defendant is, in appropriate circumstances, constitutionally permissible. To that end, in such cases, the state files a motion pursuant to *State v. Jarzbek*, [204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988)], and a hearing is held to determine whether it is necessary to exclude a defendant from the room during the videotaping of a child victim's testimony in order to preserve the accuracy and reliability of that testimony." *Ruiz* v. *Commissioner of Correction*, 156 Conn. App. 321, 324 n.2, 113 A.3d 485, cert. granted, 319 Conn. 923, 125 A.3d 199 (2015) (appeal withdrawn, January 28, 2016).

---